NOT FOR PUBLICATION [1]

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | : | |
|---|---|---|
| In re: | : | |
| | : | Civil Action No. 06-3134 (FLW) |
| PRO AUTO RECYCLERS, INC., | : | |
| | : | |
| Debtor, | : | |
| | : | |
| ANDREA DOBIN, Trustee | : | |
| | : | |
| Appellant, | : | OPINION |
| | : | |
| v. | : | |
| | : | |
| STADIUM AUTO WRECKERS, | : | |
| | : | |
| Appellees. | : | |

**WOLFSON, District Judge**

Appellant, Andrea Dobin, Trustee, appeals a final Order and Opinion of the Bankruptcy Court denying monetary relief to Debtor, Pro Auto Recyclers Inc., ("Pro Auto"). Specifically, the Trustee seeks a turnover of an account receiveable in the amount of $52,996.70 from Stadium Auto Wreckers ("Stadium Auto"). In a decision dated May 10, 2006, the Honorable U.S. Bankruptcy Judge Kathryn C. Ferguson entered judgment for Stadium Auto finding that the debtor could not establish that $52,996.70 was rightfully due and owing. This Court has appellate jurisdiction to review the decision of the Bankruptcy Court pursuant to 28 U.S.C. § 158(a). For the following reasons, the Court will affirm the decision of the Bankruptcy Court.

**I. BACKGROUND**

The debtor, Pro Auto, was formed in 1996 by Virginia Whelan ("Whelan"), the owner and operator of West Park Auto Recyclers, Joseph Wittenwiler, the owner and operator of Ocean Heights Auto Salvage, and Gary and Steven Weisner, the owners and operators of Manuel's Auto Parts. Each of these individuals was a shareholder and officer of Pro Auto with Whelan acting as CEO. The original purpose of Pro Auto was to allow the participants to retain their individual business identities, while, at the same time, sharing some resources and expenses, regulating certain business practices and eventually transacting business under the name of "Pro Auto" in the hopes of creating a nationally known brand. Indeed, the original Pro Auto participants envisioned each of their businesses becoming a franchise of Pro Auto. However, no participant ever entered into a formal franchise agreement and, instead, Pro Auto essentially functioned as a marketing group in which the participants agreed to uphold certain standards and procedures, to run payroll and insurance through common agencies, to utilize the same computer platform and to contribute to joint marketing and administrative expenses.

In April 1998, Whelan and Gary Weisner approached Steve Cilento ("Cilento"), the vice-president of Stadium Auto, and proposed that Stadium Auto become a franchisee of the Pro Auto organization. Cilento agreed to become a franchisee of Pro Auto and, although no franchise agreement was ever signed, Cilento paid a $15,000 franchise fee. In addition to the franchise fee, Stadium Auto was required to make numerous improvements to its facility to conform to Pro Auto standards. These improvements cost Stadium approximately $200,000. Moreover, Stadium Auto paid Pro Auto a 2% royalty fee for the first six months of the relationship despite the lack of a franchise agreement. In addition, beginning in July 1998, Stadium paid for some

2

joint marketing and delivery services including corporate salaries, Yellow Page advertising, and a computer lease.

However, the relationship between the parties was troubled from the start.  Beginning in 1999, the invoices for marketing services increased drastically without any explanation from Whelan.  For example, the invoices for Yellow Page ads increased from approximately $300 to between $1700 and $2300. Feb. 16, 2006 Trial Tr. ("Feb. 16 Tr. ") 34:25-35:12. In addition, Cilento testified that he never saw a contract for the Yellow Page Ads, nor did he ever receive proof that Stadium Auto was, in fact, included in those ads.  Feb. 16, Tr. 36:20-23; 34:1-16.  At trial, Cilento testified that he repeatedly asked Whelan to provide him with a breakdown of costs for which he was being billed but that Whelan refused. Id. at 29:10-30:22. Similarly, despite a request that Whelan provide Cilento with the lease agreement for the computer system, she never did so.  Id. 40-42.  Indeed, Cilento testified that despite these numerous complaints to and requests for an explanation, Whelan's sole response was that Stadium could leave the organization.  Id. at 29:10-30:22; 37:2-19.

Thereafter, following Whelan's refusal to provide an explanation for the costs, in April 2001, Stadium stopped paying Pro Auto for corporate salaries and Yellow-Page ads.  In November 2002, Stadium stopped paying for the computer lease.  Finally, in December 2002, Stadium terminated its relationship with Pro Auto.  Pro Auto, however, continued to send invoices and demand letters to Stadium Auto.  In response, on May 6, 2003, Cilento sent Whelan a fax stating: "This fax is to let you know that we do plan to pay you for all outstanding Pro Corp invoices we rightfully owe you for. We will continue to make payments on the following invoices: 1389, 1439, 1496, 1579, 1642, 1644, 1708, 1710, 1840, 2238, 2233, 2285, 2339, 2359, 2379, 2380,

2400, 2405 & 2410. . . .As for all the other invoices we owe you for (mainly PCM yellow pages) we will pay for any charges we signed for, and rightfully owe. We are still looking into those PCM invoices to be sure that those charges pertain to us."

On February 18, 2004, Pro Auto filed a voluntary petition under Chapter 7 of the Bankruptcy Code (11 U.S.C. § 101 et seq.) in the United States Bankruptcy Court for the District of New Jersey.  On that date, Pro Auto disclosed allegedly outstanding accounts receiveable from certain participants in Pro Auto's organization; these participants included Stadium Auto.

On February 26, 2004, Andrea Dobin was appointed Chapter 7 Trustee and qualified for and accepted the appointment. The one-count Complaint giving rise to this appeal, <u>Andrea Dobin, Trustee v. Stadium Auto Wreckers</u>, Adv. Pro. No. 04-2602, was filed by the Trustee on September 10, 2004, and seeks recovery of an alleged outstanding balance of $52,996.70. Subsequent to the filing of an Answer by Defendant, Stadium Auto Wreckers, the Trustee filed a Motion for Partial Summary Judgment.   On November 1, 2005, the Bankruptcy Court entered an Order denying the motion filed by the Trustee.  A two day trial before the Bankruptcy Court took place on January 10, 2006 and February 16, 2006, and, on June 5, 2006, the Bankruptcy Court entered Judgment for the Defendant.  Specifically, the Bankruptcy Court dismissed the Trustee's complaint finding that the Trustee had not met her burden of proving that any of the $52,996.70 was owed by Stadium Auto.

Thereafter, on June 14, 2006, the Trustee filed a Notice of Appeal in the Bankruptcy Court and on July 12, 2006, the Notice of Appeal was filed in the United States District Court for the District of New Jersey.  Specifically, the Trustee argues that: (1) the Bankruptcy Court erred when it failed to find that the relationship between Pro Auto and Stadium created an implied

contract; (2) that the court erred by failing to give weight to the decision-making authority of Whelan and that the testimony demonstrated that Whelan could properly contract for Pro Auto members including Stadium; (3) that the court erred by finding that May 2003 fax sent by Cilento did not amount to a written acknowledgment of the debt owed; and (4) that the Bankruptcy Court erred in its determination that the Trustee could not use the doctrine of quantum meruit to recover the $52,996.70 from Stadium Auto.

## II. JURISDICTION

Jurisdiction of the district courts over appeals from orders of bankruptcy courts is governed by 28 U.S.C. § 158(a), which provides, in relevant part, that "[t]he district courts of the United States shall have jurisdiction to hear appeals (1) from final judgments, orders, and decrees . . . ." 28 U.S.C. § 158(a).  An appeal under 28 U.S.C. § 158(a) "shall be taken in the same manner as appeals in civil proceedings generally are taken to the courts of appeals from the district courts . . . ." 28 U.S.C. § 158 (c)(2).

## III. STANDARD OF REVIEW

"The proper standard of review to be applied by a district court when reviewing a ruling of a bankruptcy court is determined by the nature of the issues presented on appeal." Baron & Budd, P.C. v. Unsecured Asbestos Claimants Committee, 321 B.R. 147, 157 (D.N.J. 2005).  Legal conclusions of the bankruptcy court are subject to de novo or plenary review by the district court. Donaldson v. Bernstein, 104 F.3d 547, 551 (3d Cir.1997); Chemetron Corp. v. Jones, 72 F.3d 341, 345 (3d Cir.1995). The factual determinations of the bankruptcy court are not to be set aside

unless "clearly erroneous." See Fed. R. Bankr.P. 8013; Chemetron, 72 F.3d at 345; In re Indian Palms Assocs., Ltd., 61 F.3d 197, 203 (3d Cir.1995). On review of the factual findings of a bankruptcy court, a district court must "give 'due regard' to the opportunity of that court to judge first-hand the credibility of the witnesses." Fellheimer, Eichen & Braverman, P.C. v. Charter Technologies, Inc., 57 F.3d 1215, 1223 (3d Cir.1995). Where a matter presents mixed questions of law and fact, it is appropriate to apply the relevant standard to each component of the issue. Chemetron, 72 F.3d at 345.

**IV.  DISCUSSION**

1. Implied Contract

   Initially, the Trustee argues that the Bankruptcy Court erred when it found that the relationship between Pro Auto and Stadium Auto did not create an implied contract. Specifically, the Trustee contends that Stadium made payments to Pro Auto for certain invoices between July 1998 and December 2002 and, in return, that Stadium received benefits from being a participant in the Pro Auto organization. Thus, the Trustee argues that the Bankruptcy Court should have found that the relationship between the parties required Stadium to pay all the invoices submitted by Pro Auto. The Court does not agree.

   It is well-established that a contract implied-in-fact "'is in legal effect an express contract, and varies from the latter only insofar as the parties' agreement and assent thereto have been manifested by conduct instead of words.'" Saint Barnabas Medical Center v. Essex County, 111 N.J. 67, 77 (1988) (quoting St. Paul Fire & Marine Ins. Co. v. Indemnity Ins. Co. of North America, 32 N.J. 17, 23 (1960)); accord Restatement (Second) of Contracts § 4, comment a ("A

6

promise may be stated in words either oral or written, or may be inferred wholly or partly from conduct."). In other words, the only difference between an implied-in-fact contract and an express contract is that the parties' agreement has been manifested by conduct instead of words. Id. "Like express contracts, contracts implied in fact depend on 'mutual agreement and intent to promise ... and can be established by objective proofs.'" Id. (quoting Borough of W. Caldwell v. Borough of Caldwell, 26 N.J. 9, 29 (1958)). Therefore, the relevant inquiry when a party attempts to establish proof of agreement through conduct rather than words is whether the conduct of the defendant, as viewed by a reasonable person in the relevant custom or trade, revealed a promise to pay. Duffy v. Charles Schwab & Co., Inc., 123 F.Supp.2d 802, 804 (D.N.J. 2000). Importantly, however, "whether the parties acted in a manner sufficient to create implied contractual terms is a question of fact." Troy v. Rutgers, 168 N.J. 354, 366 (N.J. 2001).

In the instant matter, the Bankruptcy Court held a two day trial that included testimony from Whelan, Gary Weisner and Cilento. In addition, the court considered all the evidence submitted by the Trustee including invoices generated by Pro Auto, memos detailing expenses, and communications regarding Stadium Auto's failure to pay the same. Indeed, in light of the evidence presented, the Bankruptcy Court noted "[g]laringly absent was evidence of any agreement by Stadium to be responsible for those charges. The Trustee did not submit into evidence any written business agreement, minutes of meetings, or the like that would support an argument that Stadium agreed to obligate itself for those charges. . .[w]hile it is certainly possible for there to have been an oral agreement. . . the testimony at trial did not bear that out." Dobin v. Stadium Auto Wreckers, Adv. No. 04-2602 at 4 (Bankr. D.N.J. May 10, 2006). Thus, the Bankruptcy Court expressly held that there was no evidence of any agreement by Stadium Auto

7

to pay Pro Auto.  Moreover, a review of the record reveals that although Stadium Auto paid Pro Auto invoices for a period of time, when the invoice amounts increased without any explanation, Stadium stopped paying the invoices about which it had questions.  As discussed above, in the absence of a promise to pay as evidenced by words or conduct, there can be no implied contract in fact.  See Duffy, 123 F.Supp.2d at 804.  Here, not only was there no agreement that Stadium Auto would indefinitely pay invoices submitted by Pro Auto, but the fact that Stadium Auto questioned the invoices, demanded explanation from Pro Auto and eventually stopped paying signifies the absence of a promise or agreement to pay.  Thus, after a review of the record and in light of the fact that this Court must defer to the factual findings of the Bankruptcy Court, I hold that the Bankruptcy Court did not err by refusing to find that an implied contract existed between the parties.

2. Whelan's Authority

   Next, the Trustee argues that the Bankruptcy Court erred when it refused to find that Whelan, as CEO of Pro Auto, had the authority to act as an agent and make binding decisions for the participants of the trade group including Stadium Auto.  Stadium Auto, on the other hand, argues that there was no corporate relationship between Pro Auto and Stadium, that Stadium was not a shareholder or officer of Pro Auto and that there were no writings to reflect any agreement between Pro Auto or Stadium; thus, Stadium argues that the Trustee's argument must be dismissed.  The Court agrees.

     It is well-established that "an agency relationship is created when one party consents to have another act on its behalf, with the principal controlling and directing the acts of the agent."  Sears

Mortg. Corp. v. Rose, 134 N.J. 326, 338 (N.J. 1993).  Moreover, parties do not have to specifically agree to form an agency relationship; instead, "the law will look at their conduct and not to their intent or their words as between themselves but to their factual relation." Henningsen v. Bloomfield Motors, 32 N.J. 358, 374 (1960).  "Implied authority may be inferred from the nature or extent of the function to be performed, the general course of conducting the business, or from particular circumstances in the case." Carlson v. Hannah, 6 N.J. 202, 212 (1951).  Thus, even if a person is not an "actual agent," he or she may be an agent by virtue of apparent authority based on manifestations of that authority by the principal. See C.B. Snyder Realty Co. v. National Newark Banking Co., 14 N.J. 146, 154 (1953).  Indeed, the "appearance of authority must be shown to have been created by the manifestations of the alleged principal, and not alone and solely by proof of those of the supposed agent. . . the law cannot permit apparent authority to be established by the mere proof that a mountebank in fact exercised it." Hoddeson v. Koos Bros., 47 N.J.Super. 224, 232 (Super. App. Div. 1957).  In determining whether an agency relationship existed, a court must examine the totality of the circumstances to determine whether an agency relationship existed.  Sears Mortg. Corp. v. Rose, 134 N.J. at 338.

   A thorough review of the record reveals the lack of an agency relationship between Pro Auto and Stadium Auto. For example, there was no written or oral agreement between Stadium and Pro Auto to establish that Pro Auto was anything more than an informal group of auto recyclers who agreed to share certain expenses and costs in the hopes of increasing business and profits. Indeed, although the original intent was for each business to become a franchise of Pro Auto, this plan never materialized and, as discussed above, each of the Pro Auto recyclers maintained their independent names and identities.

Moreover, Stadium Auto was neither a shareholder nor an officer in Pro Auto; indeed, the Trustee's moving brief provides, "no representative of Stadium was a shareholder of Pro Auto or was entitled to participate in corporate decision-making." Trustee Moving Br. at 10.  However, despite the Trustee's explicit acknowledgment that Stadium Auto was not involved in decision-making, the Trustee comes to the surprising conclusion that "[i]n essence, Stadium abdicated its decision-making power within the Pro Auto organization when it joined as a Participant." Moving Br. at 10.  Significantly, the Trustee herself does not provide any support or citation for this unfounded theory.  Moreover, a review of the record reveals that this theory is baseless; for example, as discussed above, although the record plainly reveals that the members of Pro Auto, including Stadium, shared some joint expenses for a period of time, that at some point the expenses increased without explanation and that after repeatedly being refused an explanation or breakdown of expenses, Stadium Auto stopped paying, there is no evidence that Stadium Auto abdicated its decision making power to Pro Auto.  Indeed, the only evidence proffered by the Trustee was a set of invoices generated by Whelan and submitted to Stadium Auto; nothing in the record suggests that Stadium ever agreed to have Pro Auto act as its agent,  make binding decisions for it or agree to pay unknown expenses for an indefinite period of time.

Further, this suggestion stands in stark contrast to the Bankruptcy Court's finding that the testimony and evidence at trial did not establish the existence of an oral agreement that Stadium Auto would be responsible for the ongoing invoices.  Indeed, the Bankruptcy Court explained "[w]hile it is certainly possible for there to have been an oral agreement to pay these sums, the testimony at trial did not bear that out. <u>The testimony at trial made clear that Virginia Whelan was by and large acting unilaterally</u>. . . Even in the instances where there was prior discussion of

10

an expense. . . Stadium and others were not provided with sufficient information upon which to make an informed decision. In fact, the testimony convincingly negated such obligations. . .<u>the corporate structure appears to have been grossly abused in this situation.  The books and records of the Debtor indicate that some goods and services were exchanged between Pro Auto and Stadium on some basis, but they [sic] woefully deficient to establish exactly what obligations were rightfully imposed and rightfully remain outstanding</u>." Dobin v. Stadium Auto Wreckers, Adv. No. 04-2602 at 5 & 7 (emphasis added).  For these reasons, I find the suggestion that Stadium Auto abdicated its decision making power to be nothing more than wishful thinking.

   Moreover, to the extent that the Trustee's argument can be understood to allege that Stadium Auto's payment on some of the invoices constituted a course of dealing that would establish an agency relationship or require it to pay all the invoices from Whelan, the Court cannot agree.  Generally speaking, "[a] course of dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." N.J.Stat.Ann. 12A:1-205(a).  Applied in the instant matter, there is no evidence of a common understanding between Pro Auto and Stadium Auto.  For example, although Stadium Auto paid the initial invoices submitted by Pro Auto, in 1999, the amount of the invoices increased dramatically, and although Cilento demanded an explanation numerous times, he was continuously rebuffed by Whelan.  Thereafter, Cilento stopped paying the unexplained invoices.  Thus, instead of illustrating a common basis of understanding, the parties' course of dealing indicates nothing but a lack of communication and understanding over the services provided and the expenses charged.  Indeed, the record clearly establishes that Whelan unilaterally submitted invoices to Stadium Auto and that she refused to

provide any explanation of the services for which she was charging. For these reasons, I find that the record does not establish a course of dealing between the parties that would support the finding of an agency relationship or require Stadium Auto to pay the remaining invoices.

3. Quantum Meruit

In addition, the Trustee argues that the Bankruptcy Court erred when it refused to apply a theory of quantum meruit to the facts here. Quantum meruit is a type of quasi-contractual recovery that "rests on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another." Weichert Co. Realtors v. Ryan, 128 N.J. 427, 437 (1992). "[T]he key element of a quasi-contract claim is that one party has been unjustly enriched at the expense of another. Recovery under both doctrines is typically measured by the amount the defendant has benefitted from the plaintiff's performance." Wanaque Borough Sewerage Authority v. Township of West Milford, 144 N.J. 564, 575 (1996). Recovery is permitted in quasi-contract because one party has conferred a benefit on the other and, in the circumstances, it would be unjust to deny recovery. Id. To recover under quantum meruit, a plaintiff must establish: 1) that the services were performed in good faith, 2) the services were accepted by the person for whom they were rendered, 3) plaintiff reasonably expected compensation for performing the services, and 4) the value of the services is reasonable.

With this standard in mind, the Bankruptcy Court found that the Trustee had not established whether the value of the services to Stadium Auto exceeded the amount that Stadium Auto had already paid; indeed, the court held that "there is no evidence that Stadium has been unjustly enriched." Thus, the Bankruptcy Court held that it could not apply the theory of quantum meruit

12

to this case. This Court agrees.

To begin, the record lacks any evidence showing that Stadium Auto was unjustly enriched by the services provided by Pro Auto. Indeed, the record nearly establishes the opposite; for example, in addition to paying numerous invoices during the first few years of the relationship, Stadium Auto paid Pro Auto a $15,000 franchise fee that was never returned, as well as royalty fees, and invested in $200,000 worth of upgrades to enable it to conform to the alleged franchisor's standards. Moreover, the only evidence that could establish the services that were performed or their alleged value are the invoices that were unilaterally sent by Whelan to Stadium Auto; there is no evidence to show that the services were actually performed on behalf of Stadium Auto, that it was reasonable for Pro Auto to expect compensation or that the value of the services charged was reasonable. Thus, I find that the Bankruptcy Court did not err in finding that a theory of quantum meruit could not be applied in this case.

4. <u>The May 2003 Fax</u>

On May 6, 2003, Stadium Auto submitted a fax to Pro Auto stating: "This fax is to let you know that we do plan to pay you for all outstanding Pro Corp invoices we rightfully owe you for. We will continue to make payments on the following invoices: 1389, 1439, 1496, 1579, 1642, 1644, 1708, 1710, 1840, 2238, 2233, 2285, 2339, 2359, 2379, 2380, 2400, 2405 & 2410. . . .As for all the other invoices we owe you for (mainly PCM yellow pages) we will pay for any charges we signed for, and rightfully owe. We are still looking into those PCM invoices to be sure that those charges pertain to us." The Bankruptcy Court held that the fax did not amount to an admission of any debt owed by Stadium because the fax was limited to "all outstanding Pro Corp

invoices we rightfully owe you for." Moreover, the Bankruptcy Court found that the list of invoice numbers did "not indicate that the invoices listed fall into that category; it simply says that payment will be made on those invoices." On appeal, Pro Auto argues that the Bankruptcy Court erred when it found that the May 2003 fax did not amount to a written acknowledgment of debt owed by Stadium Auto to Pro Auto; specifically, the Trustee contends that Stadium's Fax establishes that it owes Pro Auto at least $26,977.97. The Court does not agree.

    To begin, the Court finds that, standing alone, the May 6, 2003 fax is, at best, ambiguous. Indeed, although Stadium Auto attempts to delineate between two categories of invoices – those it would "continue to make payments on" and those it was "still looking into" – Stadium Auto clearly states at two separate times that it would only pay the outstanding invoices it "rightfully owe[d]" Pro Auto. Further, there was no indication in the fax that the invoices listed by Stadium Auto fell into the category of charges that Stadium rightfully owed Pro Auto. Moreover, the Bankruptcy Court did not consider the fax in a vacuum; indeed, Cilento testified about the fax on direct examination and on cross examination. Specifically, on direct examination, Cilento testified that he sent the fax "to keep Brian and Ginny off my back. . .as weeks went on after I left Pro, I come to find out numerous things that were wrong with Pro and what they were billing me for. . .I had lots of suspicions about all these bills. . .They weren't straight with me at all on any of them. Never were. . .I just wanted to keep these people off my back and clarify a lot of these bills of what I was getting billed for." Feb. 16 Tr. 51:7- 52:14. Further, during cross examination, Cilento testified that he never intended on making payment on the invoices listed on the May 6, 2003 fax. Id. 74:5-15. Therefore, in light of the ambiguities inherent in the fax itself, Cilento's trial testimony and the credibility determinations made by the Bankruptcy Court

as the original factfinder in this matter, I hold that the Bankruptcy Court did not err when it refused to consider the fax as an admission of debt owed by Stadium Auto to Pro Auto.

## V. CONCLUSION

For the foregoing reasons, the Court will affirm the Bankruptcy Court's entry of Judgment for the Defendant.  An appropriate order will follow.


Dated: January 26, 2007                              s/ Freda L. Wolfson
                                                                                               Honorable Freda L. Wolfson
                                                                                               United States District Judge